IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Khadidja Issa; Q.M.H.**, a minor, individually, by and through his parent, Faisa Ahmed Abdalla; **Alembe Dunia; Anyemu Dunia; V.N.L.**, a minor, individually by and through her parent, Mar Ki; **Sui Hnem Sung; and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**The School District of Lancaster,**<br><br>Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT** |

## I.   PRELIMINARY STATEMENT

1. Plaintiffs in this class action lawsuit are limited-English-proficient ("LEP") immigrants who, while aged 17-21, were, are, or may be in the future denied their right to equal educational opportunities and meaningful public education by Defendant School District of Lancaster ("SDOL" or the "District") in violation of the U.S. Constitution, federal civil rights statutes, and Pennsylvania education law.

2. The Named Plaintiffs are refugees who have fled war, violence, and persecution from their native countries of Somalia, Sudan, Democratic Republic of Congo, and Burma. Having finally escaped their turbulent environment to resettle in America, these young immigrants yearn to learn English and get an education so they can make a life for themselves.

3. SDOL has a custom, practice, and policy of refusing to admit older immigrant LEP students into the District's regular high school, McCaskey. SDOL either refuses to enroll them altogether or assigns them to an "alternative" school, Phoenix Academy.

4. Phoenix Academy is an alternative high school for "underachieving" students operated for SDOL on a contract basis by Camelot Education, a private company that is known for operating disciplinary schools. With its highly restrictive and overtly confrontational environment, Phoenix is run more like a disciplinary school than a traditional public high school. Students are subject to pat-down searches, prohibited from bringing belongings into or out of the school, forced to wear colored shirts that correspond with behavior and not allowed to wear watches or jewelry, expected to "confront" peers "exhibiting negative behavior," and can be subjected to physical and even violent restraint, as part of the school's disciplinary policy. Phoenix lacks adequate and appropriate supports for immigrant LEP students, including any transition program like the International School at McCaskey, which is a "one-year transition program designed to address the needs of students who are new to the country or the district and who have limited English proficiency." Phoenix is academically inferior by all measures and offers no extra-curricular opportunities. Many immigrant LEP students placed at Phoenix drop out because they are not provided sufficient supports to overcome language barriers to enable them to learn the core curriculum, and because of unchecked, persistent bullying in a severe, authoritarian environment that is particularly ill-suited for refugees.

5. SDOL's refusal to admit older immigrant LEP students into the McCaskey High School Campus ("McCaskey")—with its superior academic program, International School specially tailored to their academic needs as newcomers entering the school system, and superior language supports and accommodations—results in denial of a meaningful and equal education to Plaintiffs and Class Members that violates the Equal Education Opportunity Act ("EEOA"), 20 U.S.C. § 1703(f); Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* ("Title VI"); the Due Process Clause of the Fourteenth Amendment to the U.S.

Constitution, U.S. Const., amend XIV, § 1; the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, U.S. Const., amend XIV, § 1; and various provisions of the Pennsylvania Public School Code of 1949, 24 Pa. Stat. § 13-1301, *et seq*.

6. Plaintiffs seek declaratory and injunctive relief, including a preliminary injunction, directing SDOL to admit Plaintiffs and Class Members to McCaskey and to make available the full range of curricular and extra-curricular programs and activities, including access to the International School and all appropriate accommodations and modifications to overcome language barriers, in time to begin the fall semester on August 30, 2016.

## II.   JURISDICTION AND VENUE

7. The claims in this action arise under the Equal Education Opportunities Act ("EEOA"), 20 U.S.C. § 1703(f); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983; and 24 Pa. Stat. § 13-1301 and 22 Pa. Code, Chapter 11.

8. This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court may exercise supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

9. Venue in this district is proper under 28 U.S.C. § 1391(b) because the defendant is subject to personal jurisdiction within the Eastern District of Pennsylvania and the events that give rise to this action occurred within the Eastern District of Pennsylvania.

### III. THE PARTIES

#### A. Named Plaintiffs

**Khadidja Issa**[1]

10. Plaintiff Khadidja Issa is an 18-year-old refugee from Sudan.

11. Refugee status is governed by the 1951 Convention relating to the Status of Refugees ("Refugee Convention"), a United Nations multilateral treaty, to which the United States is a signatory, that defines who is a refugee, and sets out the rights of individuals who are granted asylum and the corresponding responsibilities of nations that grant asylum. Article 1 of the Refugee Convention, as amended by the 1967 Protocol, defines a refugee as:

> A person who, owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

12. The screening process to admit refugees is rigorous, and typically takes 18-24 months. *See, e.g., Refugees*, U.S. Citizenship & Immigration Services, https://www.uscis.gov/humanitarian/refugees-asylum/refugees (last visited July 12, 2016); *U.S. Refugee Admissions Program*, U.S. Department of State, http://www.state.gov/j/prm/ra/admissions/ (last visited July 12, 2016).

13. In September 2015, Khadidja, her mother, and her siblings came to the U.S. as refugees. Lutheran Immigration Refugee Services ("LIRS"), a refugee resettlement agency, helped them resettle in Lancaster, Pennsylvania, where they still live.

---

[1] Each of the Named Plaintiffs have verified the allegations of the Complaint specifically pertaining to them. Those verifications are attached hereto as Exhibit A.

-4-

14. Khadidja's first language is Fur, an indigenous language of Darfur, Sudan. She also speaks Arabic. Neither she nor her mother spoke, read, wrote or understood English when they arrived in the U.S.

15. SDOL initially refused to enroll Khadidja in any District school. After several months SDOL relented, but made Khadidja attend Phoenix Academy. She was not given the option of attending McCaskey.

**Q.M.H.**

16. Plaintiff Q.M.H. is a seventeen-year-old refugee from Somalia. Q.M.H. is a pseudonym that is being used because he is a minor. As a minor, he brings this lawsuit by and through his mother, Faisa Ahmed Abdalla. Q.M.H., his mother, and his four siblings escaped the conflict in Somalia and took refuge in Egypt, where they lived for five years in a refugee camp.

17. Q.M.H. and his mother speak and understand only Somali and Arabic. They had no experience speaking or learning English before their arrival in the United States.

18. Q.M.H. and his family came to the United States as refugees in September 2015. LIRS helped them resettle in Lancaster, Pennsylvania, where they still live.

19. Defendant SDOL refused initially to admit Q.M.H. into any District school. After months of persistence by LIRS case workers, SDOL relented in January 2016, but admitted Q.M.H only to Phoenix. He was not given the option of attending McCaskey. Q.M.H. left Phoenix in April due to SDOL's failure to provide a program that meets his language and learning needs and its failure to check persistent and serious bullying of Q.M.H.

**Alembe Dunia and Anyemu Dunia**

20. Plaintiffs Alembe Dunia and Anyemu Dunia are brothers, aged 20 and 18, respectively. Alembe and Anyemu are refugees from the Democratic Republic of Congo. They spent twelve years in a refugee camp in Mozambique after fleeing the war in Congo. Their

father died in the camp. Alembe and Anyemu are native Swahili speakers, who also speak some Portuguese. Neither they nor their mother spoke, read, wrote or understood English when they arrived in the U.S.

21. In November 2014, Alembe and Anyemu, along with their mother and siblings, came to the United States as refugees. LIRS helped resettle them in Lancaster, where they still live.

22. In December 2014 and thereafter, SDOL refused to admit Alembe, who was 19 years old at the time, into any District school. SDOL refused to enroll then-17-year-old Anyemu in McCaskey, only allowing him to attend Phoenix, where he has not been provided sufficient language and other supports to learn and where the restrictive, hostile environment makes him uncomfortable. Despite the deficient language supports and educational instruction, SDOL recently advised Anyemu that he has managed to accrue four years of credits at Phoenix in twenty months and would be graduated later this summer.

**Sui Hnem Sung and V.N.L.**

23. Plaintiffs Sui Hnem Sung and V.N.L. are sisters, 19 and 17 years old, respectively. V.N.L is a pseudonym that is being used because she is a minor. As a minor, she brings this lawsuit by and through her mother, Mar Ki. They are refugees from Burma. Sui Hnem Sung and V.N.L. are native Hakha Chin speakers. Neither they nor their parents spoke, read, wrote or understood English when they first arrived in the United States.

24. In November 2015, Sui Hnem Sung, V.N.L., their mother, and younger brother and sister came to the U.S. as refugees, joining their father who had arrived in 2013. Church World Services ("CWS"), a refugee settlement agency, helped them settle in Lancaster, where they still live.

25. SDOL refused to admit Sui Hnem Sung and V.N.L. to McCaskey, instead admitting them only to Phoenix Academy, where they are not given sufficient language and other supports to access the curriculum.

### B. Defendant

26. Defendant, SDOL, is a school district within the Commonwealth of Pennsylvania organized pursuant to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 Pa. Stat. §§ 1-101, *et seq*. The District's headquarters and principal place of business is located at 251 S. Prince Street, Lancaster, Pennsylvania 17603. The District is a Local Educational Agency ("LEA") responsible for ensuring that Plaintiffs receive an education consistent with federal and state law. The District, as a public entity, receives federal funds and is subject to the EEOA and Title VI of the Civil Rights Act of 1964. The District is also required to comply with state education laws pursuant to the Pennsylvania Code.

## IV. LEGAL FRAMEWORK

27. Education is a fundamental right under the Pennsylvania Constitution and the Pennsylvania Public School Code of 1949, giving every child aged 6 through 21 the right to a free public education in that child's school district of residence. *See* Pa. Const. Art. III, § 14; 24 Pa. Cons. Stat. Ann. § 13-1301; *Sch. Dist. of Wilkinsburg v. Wilkinsburg Educ. Ass'n*, 667 A.2d 5, 9 (Pa. 1995) (interpreting Article III, Section 14 of the Pennsylvania Constitution to make public education a fundamental right in the Commonwealth). A child who turns 21 during the school term and who has not graduated from high school has the right to continue to attend the public schools in his district free of charge until the end of the school term. 24 Pa. Cons. Stat. Ann. § 13-1301; *see also* 22 Pa. Code § 12.1(a).

28. The right to a free public education extends equally to immigrant students who do not speak English as their primary language and who have a limited ability to read, speak, write, or understand English.

29. Such students are referred to in the law as "LEP students," which stands for limited-English-proficiency students,[2] or as "ELLs," which denotes English Language Learners, or simply "ELs," English Learners.[3] These terms are used interchangeably in this Complaint.

30. A school district does not satisfy its obligations under federal and state law by merely providing LEP students the exact same services and programs as native speakers:

> there is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education. Basic English skills are at the very core of what these public schools teach. Imposition of a requirement that, before a child can effectively participate in the educational program, he must already have acquired those basic skills is to make a mockery of public education. We know that those who do not understand English are certain to find their classroom experiences wholly incomprehensible and in no way meaningful.

*Lau v. Nichols*, 414 U.S. 563, 566 (1974).

31. Title VI of the Civil Rights Act of 1964 prohibits recipients of federal financial assistance from engaging in national origin discrimination, which has been interpreted to require school districts to take affirmative steps to address language barriers so that LEP students can participate meaningfully in schools' educational programs, both curricular and

---

[2] *See, e.g.*, No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1961 (defining the term "limited English proficient.").

[3] *See, e.g., Glossary*, National Center for Education Statistics, https://nces.ed.gov/programs/coe/glossary.asp#ell (last visited July 12, 2016) (defining term English Language Learner).

extra-curricular. *See* 42 U.S.C. § 2000d (prohibiting race, color, and national origin discrimination in any program or activity receiving federal financial assistance); *Lau*, 414 U.S. 563; 34 C.F.R. § 100.3(b)(1), (2).

32. Another federal statute, the EEOA provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

33. More specifically, these federal laws have been interpreted and applied to require that school districts do the following:

   a. Identify and assess ELL students in need of language assistance in a timely, valid, and reliable manner;

   b. Provide ELL students with a language assistance program that is educationally sound and proven successful;

   c. Provide sufficient staff and support for the language assistance programs for ELL students;

   d. Ensure that all ELL students have equal opportunities to meaningfully participate in all curricular and extracurricular activities, including the core curriculum, graduation requirements, specialized and advanced courses and programs, sports, and clubs;

   e. Ensure that students with disabilities, as defined by federal law, are evaluated in a timely and appropriate manner for special education and disability-related services and their language needs are considered in evaluations and delivery of services;

   f. Monitor and evaluate ELL students in language assistance programs to ensure their progress with respect to acquiring English proficiency and grade level core content, exit ELL students from language assistance programs when they are proficient in English, and monitor exited students to ensure they were not prematurely exited and that any academic deficits incurred in the language assistance program have been remedied;

      g.    Evaluate the effectiveness of a school district's language assistance program(s) to ensure that ELL students in each program acquire English proficiency and that each program was reasonably calculated to allow ELL students to attain parity of participation in the standard instructional program within a reasonable period of time; and

      h.    Ensure meaningful communication with ELL parents. Catherine E. Lhamon & Vanita Gupta, U.S. Dep't of Justice & U.S. Dep't of Educ., *Dear Colleague Letter: English Learner Students and Limited English Proficient Parents*, 8-9 (Jan. 7, 2015), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-el-201501.pdf.

34.    Pennsylvania law tracks federal law, but provides additional specificity. For instance, state law provides that a "child's right to be admitted to school may not be conditioned on the child's immigration status . . . [and, thus, a] school may not inquire regarding the immigration status of a student as part of the admission process." 22 Pa. Code § 11.11(d).

35.    Pennsylvania law clarifies that "every school district shall provide a program for each student whose dominant language is not English for the purpose of facilitating the student's achievement of English proficiency and the academic standards under § 4.12 . . . ." 22 Pa. Code § 4.26. It also specifies that "[p]rograms under this section shall include appropriate bilingual-bicultural or English as a second language (ESL) instruction." *Id.*

36.    Guidance issued by the Pennsylvania Department of Education to implement federal and state laws delineates how students should be identified, evaluated, monitored, and exited from a language program; recommends a specific number of instruction hours for ELL students based on their level of proficiency; and expressly states that language program administrators consider "LEA demographics, and student characteristics" in planning their instructional model. *See Educating Students with Limited English Proficiency (LEP) and English Language Learners (ELL)*, Pennsylvania Department of Education Basic Education Circulars (last modified Apr. 14, 2009),

http://www.education.pa.gov/Documents/Codes%20and%20Regulations/Basic%20Education%20Circulars/PA%20Code/Educating%20Students%20with%20Limited%20English%20Proficiency%20(LEP)%20and%20English%20Language%20Learners%20(ELL).pdf.

37. Pennsylvania also requires all teachers in language instructional programs to hold a Program Specialist ESL Certificate. *Id.* at 7 ("All teachers in language instructional programs must hold the certification and endorsements required by [the Pennsylvania Department of Education]."); 24 Pa. Stat. § 15-1511 ("[T]he teaching of subjects in a language other than English may be permitted as part of a sequence in foreign language study or as part of a bilingual education program if the teaching personnel are properly certified in the subject fields."). All school districts with ELLs enrolled must offer staff development related to ESL for all personnel as part of the Professional Development Act 48 Plan.

38. Furthermore, Article 22 of the Refugee Convention, under which the U.S. accepted all of the Named Plaintiffs, also obliges host countries to provide them a free public education equivalent to that offered native students.

39. In sum, federal and Pennsylvania law requires that all school districts provide ELLs with appropriate language programs and assistance to help ensure that they can access the curriculum, attain English proficiency, develop high levels of academic attainment in English, and meet the same academic content and academic achievement standards that all students are expected to meet.

## V. FACTUAL ALLEGATIONS

### A. The School District of Lancaster

40. SDOL has a custom, practice, and policy of refusing to enroll immigrant LEP students, aged 17-21, in the District's main high school, McCaskey. That school offers a program known as the International School, which is specially designed for newly-arrived

immigrant LEP students. Instead of placing older immigrant students in McCaskey's International School, SDOL denies them enrollment in the District altogether or discourages or delays their admission, and if it does admit the students, funnels them to a substantially inferior alternative high school called Phoenix Academy. Phoenix operates under an educational theory that predictably denies these students meaningful education; it is neither pedagogically sound for recent immigrant ELLs nor reasonably calculated to overcome their cultural and language barriers.

41. SDOL annually enrolls about 11,300 students with a budget of about $190 million.

42. SDOL serves a significant immigrant population. Approximately 18% of students are ELLs, and about 4.5% of the students are refugees. (Refugees constitute about one-quarter of the ELLs in the District.)

43. The District operates three high schools: the McCaskey High School Campus (referred to herein as "McCaskey"), which has two buildings, JP McCaskey and McCaskey East; Phoenix Academy; and Buehrle Academy.

44. McCaskey enrolls the vast majority of the District's high-school-age students, about 2,600 students each year.

45. SDOL operates McCaskey like a traditional public high school, with a large array of curricular and extra-curricular offerings and a fairly typical degree of student freedom in movement and expression.

46. SDOL contracts with a private company, Camelot Education, to operate the District's two alternative high schools, Buehrle Academy and Phoenix Academy.

47. Camelot Education is a private company that specializes in alternative schools. Camelot holds itself out as running two types of schools relevant to this case. Camelot describes its "Transitional Schools" as "serv[ing] students in need of a temporary placement due to behavioral or disciplinary infractions." Camelot considers Buehrle a "transitional school." Camelot describes "accelerated Schools" as "offer[ing] students a highly structured, engaging, direct instruction pathway to graduation," and an "opportunity for students from the ages 16-21 who are overage and under-credited to graduate in 2.5 years or less."

48. Camelot characterizes Phoenix Academy as both an accelerated school and a transitional school. The Curriculum Guide for Phoenix lists "three basic goals" for "all students" at Phoenix: 1) "To recover credits needed for graduation," 2) "To change behavior from anti-social to pro-social," and 3) "To develop life skills that will help sustain this change."

49. Buehrle Academy operates under Pennsylvania law as an "Alternative Education for Disruptive Youth" ("AEDY") program, which is "designed for seriously and persistently disruptive students" in grades 6-12. Under state law, students can only be assigned to an AEDY school following an informal hearing. *See* 24 Pa. Stat. § 19-1902-C(2) (AEDY applicants must comply with informal hearing procedures set forth in 22 Pa. Code § 12.8(c), relating to hearings). The purpose of such a hearing is to determine whether the student meets the criteria for referral to an AEDY program, *i.e.*, that at the time of the recommended transfer the student demonstrates, to marked degree, specific disruptive conduct. *See id.* The maximum enrollment in Buehrle is 135 students.

50. Camelot began operating Phoenix Academy under contract with the District in 2011. Then-Superintendent of the District, Pedro Rivera, announced that transferring

operation of Phoenix to Camelot Education would save the District more than $1 million a year, or $3.6 million over the term of the initial 3-year contract.

51. Camelot has described Phoenix Academy publicly as a high school for "students with academic and attendance problems," "second-chance students," and "students who have lost their way."

52. Because Phoenix is an "accelerated" or "credit recovery" program, Phoenix students earn credits at a much faster rate than they could at a regular school, even though they receive comparable instruction time.

53. The maximum enrollment at Phoenix Academy is 350 students. Last year, Phoenix enrolled 323 students, approximately 95% of whom were students of color.

### B. McCaskey Versus Phoenix

54. SDOL's refusal to enroll immigrant LEP students, like Plaintiffs, in McCaskey deprives them of an equal and meaningful education. In comparison to McCaskey, Phoenix is substantially inferior by every measure.

55. Academically, McCaskey is clearly superior to Phoenix.

   a. The students-to-teacher ratio at McCaskey is 14:1, whereas at Phoenix it is 42:1;

   b. The percentage of classes taught by "highly qualified teachers," as defined by the Pennsylvania Department of Education, at McCaskey is 92% whereas 0% of the classes at Phoenix are taught by "highly qualified teachers";

   c. The Pennsylvania Department of Education's School Performance Profile[4] for the 2014-15 school ranked McCaskey twice as high as Phoenix with scores of 60.4 and 30.3, respectively;

---

[4] The Pennsylvania Department of Education's School Performance Profile provides the public with a comprehensive overview of student academic performance in every public school (including charter and alternative schools) and measures academic outcomes.

-14-

    d. For advanced academic courses, which the District characterizes as "highly recommended for every student planning to attend college," McCaskey offers 10 Advanced Placement ("AP") courses and an International Baccalaureate ("IB") program—one of only 15 Pennsylvania high schools to offer such a program—whereas Phoenix offers no AP courses and no IB program;

    e. For Advanced-Placement testing, 32% of students at McCaskey take AP tests, whereas 0% of Phoenix students take AP tests;

    f. According to the Pennsylvania Department of Education, "college ready" students comprise 83% of McCaskey students whereas 0% of Phoenix students are deemed "college ready";

    g. There are many extra-curricular activities, clubs, and opportunities, including interscholastic and other athletic teams, at McCaskey, whereas Phoenix offers no sports teams or extra-curricular activities on campus.

56. Beyond the stark differences in academic opportunities and quality, Phoenix provides more limited and less tailored ESL instruction and few modifications to instruction and testing in regular education classes.

57. At McCaskey, 19.46% of the students are ELLs whereas at Phoenix, 28.17% of students (90 students) are ELLs.

58. SDOL recognizes the unique challenges that newly-arriving immigrant ELLs face, and provides a one-year (sometimes longer) transitional program (the "International School") for such students at McCaskey.

59. The International School program at McCaskey for students in grades 9-12 is designed to provide intensive ESL support and content-based ESL instruction in a one-year program (with exceptions) primarily for entering students.

60. Students in the International School program participate in ESL classes and "sheltered instruction" science, math, and social studies courses,[5] as well as "enrichment subjects."

61. Other key features of the International School program, according to SDOL documents, include close communication with families, access to appropriate translation services[,] and assistance in connecting to community resources.

62. The goal of the program is for students to develop a beginning level of English proficiency and prepare to enter mainstream classes. At the end of each marking period, International School students are supposed to have the opportunity to transfer to the next ESL level within the International School or leave the International School, depending on their English language proficiency score.

63. Phoenix has no International School and no comparable transitional program for newcomers.

64. Phoenix also offers no "sheltered instruction" for ELL students.

65. Upon information and belief, Phoenix does not have any certified ESL teachers on staff.

66. According to SDOL documents describing the schools' operations, there are other significant differences, beyond the International School, between the ESL instructional approaches taken at McCaskey and Phoenix:

---

[5] "Sheltered instruction" is "adapted to the students' English proficiency levels and provides modified curriculum-based content. Teachers enhance context by providing visual props, hands-on learning experiences, drawings, pictures, graphic organizers, and small group learning opportunities." Sch. Dist. of Lancaster, ESL Instructional Services Matrix (on file with Plaintiffs' counsel). "Sheltered English instruction programs offer instruction to ELLs at lower English proficiency levels, who are often newcomers to the United States." *Id.*