IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KHADIDJA ISSA, Q.M.H., a minor, individually, by and through his parent, Faisa Ahmed Abdalla, ALEMBE DUNIA, ANYEMU DUNIA, V.N.L., a minor, individually, by and through her parent, Mar Ki, SUI HNEM SUNG, AND ALL OTHERS SIMILARLY SITUATED, | : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 16-3881 |
| v. | : : | |
| THE SCHOOL DISTRICT OF LANCASTER, | : : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                                   August 26, 2016

State law guarantees all individuals a "free and full education" until they graduate or turn 21. Federal law requires that schools take "appropriate action to overcome language barriers" so that education is not rendered meaningless. The plaintiffs are six current or prospective students, living within a school district administered by the defendant. The plaintiffs seek a preliminary injunction, allowing them to attend an International School at a regular high school that meets those state and federal requirements, rather than an alternative school that they claim does not, if the defendant chooses to enroll them at all. The defendant maintains that both schools, as well as its enrollment procedures, comply with state and federal law.

The plaintiffs advance numerous legal theories in support of their motion, but the court resolves this motion by answering two questions: (1) can a school district deny an eligible individual enrollment because the district determines the individual will likely not graduate before turning 21; and (2) has a school district taken appropriate action to overcome language

barriers when it diverts a student away from its International School to an alternative school where virtually all of a student's courses are taught in a language and manner that the student cannot comprehend? The answer to both questions is no and accordingly, the court will grant the plaintiffs' motion.

### I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Pennsylvania law guarantees a free and full education to all individuals from the age 6 to 21, who have not yet graduated. 24 P.S. § 13-1301. After a new student seeking enrollment submits all requisite paperwork, the school district must enroll the student within five days. 22 Pa. Code § 11.11(b). The Equal Education Opportunity Act is a federal statute. It requires "educational agenc[ies]," such as city school districts, to "take appropriate action to overcome language barriers that impede equal participation by its students in instructional programs."[1] 20 U.S.C. § 1703(f).

The named plaintiffs are all refugees, ages 17-20, who speak little or no English. *See* Compl. at ¶¶ 1, 2, Doc. No. 1; Answer at ¶¶ 1, 2, Doc. No. 23. They all escaped violence and tumult in their home and other lands. Now in America, all earnestly seek to learn English, advance their education, and contribute to society. Compl. at ¶ 2; Answer at ¶ 2.

---

[1] The definition section of the Act defines "educational agency" as "a local educational agency or a 'State educational agency' as defined by section 801(k) of the Elementary and Secondary Education Act of 1965." 20 U.S.C. § 1720(a). The Act then defines a "local educational agency" as "a local educational agency as defined by section 801(f) of the Elementary and Secondary Education Act of 1965." 20 U.S.C. § 1720(b). On December 10, 2015, President Obama signed into the law the Every Student Succeeds Act, which reauthorized the Elementary and Secondary Education Act of 1965. This Act defines a "local educational agency" as

> a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools.

20 U.S.C. § 7801(30).

The defendant is the School District of Lancaster ("District"), which administers several schools subject to the laws referenced above. Compl. *at* ¶ 43; Answer at ¶ 43. Two of the schools are relevant to this case: McCaskey High School ("McCaskey"), which is operated by the District, and Phoenix Academy ("Phoenix"), which is operated by a private, for-profit corporation pursuant to a contract with the District.

McCaskey is a credit to the state. Its campus consists of two smaller schools. One is J.P. McCaskey, which is a traditional public high school with all of the standard and extracurricular programs one might reasonably expect. Compl. at ¶ 45; Answer at ¶ 45. The other is McCaskey East, also known as the International School, which operates a program essentially designed to teach English to those students who speak little English, if any at all. Compl. at ¶ 59; Answer at ¶ 59; Ex. 8. Those students generally attend the International School for one year, receiving focused instruction in the English language and American culture, after which time they attend regular classes with the general population of students. Compl. at ¶ 59; Answer at ¶ 59. New students are enrolled in the International School depending primarily on their ability (or lack thereof) to speak English, so long as they are not also over 17 with no academic credits. *Compare* Exs. 8, 25 *with* Notes of Testimony ("N.T."), Jacques Blackman, Aug. 22, 2016, 9:27 AM-12:34 PM, 55:20-56:18.

Phoenix is a little different. It focuses primarily on credit recovery for those students who are overage and under-credit. Ex. 84; Compl. ¶ 47; Answer ¶ 47. Phoenix offers students the opportunity to take an accelerated curriculum, and earn a high school diploma in roughly half the time of a traditional high school. Ex. 84. In Phoenix, a significant portion of a student's grade is based on behavior and attendance, also known as "seat time." *See*, *e.g.*, N.T., Jandy Rivera, Aug. 18, 2016, 9:42 AM-2:11 PM, 53:18-25, 54:1-8. Phoenix offers some

accommodations for those with limited English proficiency.  N.T., Aura Heisey, Aug. 22, 2016, 4:13 PM-5:45 PM, 10:1-14.  For those students, they may take a daily English as a Second Language ("ESL") class.  *Id.*  All other courses are with the general student population and taught in English.  N.T., Khadidja Issa, Aug. 16, 2016, 1:29 PM-5:27 PM, 44:1-21.

Enrollment in Phoenix, rather than McCaskey, is generally a choice offered to students and their families.  N.T., Jacques Blackman, Aug. 22, 2016, 9:27 AM-12:34 PM, 19:11-23.  But one group of prospective students is not offered that choice: new-to-the-district students who are over 17 years old and under-credit.  *Id.* at 19:20-20:8.  For these students, the choice is made for them, and the District unilaterally assigns them to Phoenix.  *See, e.g.*, *id.*  The District adopted this practice primarily due to concerns that those students represent a higher risk of dropping out or "aging out" before earning a high school diploma.  *See* N.T., Damaris Rau, Aug. 19, 2016, 1:29 PM-4:07PM, 39:1-13, 78:5-7; 81:18-22.  For a student, a high school diploma is often a prerequisite for future advancement.  Moreover, if a student is enrolled in a school, but does not graduate, either because they drop out or they age out, that school's graduation rate drops.  *Id.* at 72:3-15.  School funding and evaluations are in part based upon graduation rates, and the reputation of a school with a low graduation rate can suffer in the community.  *See generally id.*

The District's practice of mandatory enrollment in Phoenix applies regardless of a student's proficiency in English.  Deposition of Jacques Blackman, 43:2-44:19.  When a student with no ability to speak or understand English, such as the plaintiffs, is placed in accelerated classes, the student will cover material twice as fast as a normal school, but that material is also taught in a language that student does not understand.  On its face, this practice appears to be counterintuitive; expert testimony confirmed that the practice was unsound.  *See* N.T., Helaine Marshall, Aug. 18, 2016, 9:42AM-2:11PM, 119:1-3 ("[A]n accelerated recovery program is

4

totally inappropriate for this population."). Although the student earns (or at least is issued) a diploma and all of the attendant benefits, the student will likely graduate with limited ability, if any, to converse in English—also often a prerequisite to future advancement—and limited understanding of the content of the courses he actually took.

The practice also runs counter to the District's prior representations on how the International School would be used.  Ex. 25.  Previously, the District maintained that new students who cannot speak English will be enrolled in the International School for the first year, and, with that baseline education in the English language, would then be placed in McCaskey or, if over 19, placed in Phoenix. *Id.*

The District also does not evaluate the efficacy of the Phoenix ESL program.  N.T., Damaris Rau, Aug. 19, 2016, 1:29 PM-4:07PM, 84:16-85:4, 88:12-89:1.  Although the raw data is available, the District does not analyze the Phoenix data on its own.  N.T., Amber Hilt, Aug. 19, 2016, 1:29 PM-4:07 PM, 10:7-19.  Instead, it combines that data with data from the International School, which uses an entirely different ESL instructional model.  *See id.* at 9:20-10:19.  The practical result of commingling the data is that the District cannot quantify whether the ESL program operating at Phoenix is successful.  *See id.*

In addition to the language barriers, enrollment itself has not been a smooth process for the plaintiffs.  One plaintiff, Alembe Dunia, 20, today is still not enrolled, despite repeated attempts to enroll dating back to at least January 2015.  *See* N.T., Alembe Dunia, Aug. 17, 2016, 2:06 PM-3:56 PM, 9:16-17, 13:18-23.  Because Alembe will age out after the upcoming school year, this delay has greatly prejudiced his ability to receive the education the state promises him.  Others experienced significant delays, upwards of five months.  *See* N.T., Q.M.H., Aug. 16, 2016, 1:29PM-5:27PM, 37:23-25.  One, Q.M.H., was initially denied enrollment, and only later

5

enrolled after the District learned that he was 17, not 19, a factor that has no legal significance as to the District's obligations.  *See* N.T., Jacques Blackman, Aug. 22, 2016, 9:27 AM-12:34 PM, 33:24-25, 34:1.  And in no case did the District accomplish the enrollment of the plaintiffs within the five-day period mandated by state law.

For those plaintiffs ultimately enrolled in Phoenix, a common complaint is that they did not understand the vast majority of content taught in the non-ESL classes.  *See, e.g.*, N.T., Khadidja Issa, Aug. 16, 2016, 1:29 PM-5:27 PM, 25:12-14.  Some formally requested transfer to the International School, in order to build a foundation in the English language prior to taking general classes.  *E.g.*, Ex. 26.  The District did not grant any such request.

One plaintiff, Anyemu Dunia, 18, graduated from Phoenix in the midst of the evidentiary hearing, earning a diploma in just 16 months, despite arriving with no academic credits and little-to-no ability to speak or understand English, all while recording 47 absences during those 16 months.[2]  Exs. 17, 50.  He testified that he did not know when he advanced through grade levels and required an interpreter to testify in court.  N.T., Anyemu Dunia, Aug. 17, 2016, 2:06 PM-3:56 PM, 34:13-17.

In late July, dissatisfied with the District's refusal to allow the plaintiffs to enroll in the International School, the plaintiffs filed a complaint in this court and a motion for preliminary injunction.[3]  *See* Doc. Nos. 1, 7.  The parties engaged, admirably, in expedited discovery, and the court held a five-day evidentiary hearing, during which the court heard testimony from numerous witnesses, including an expert.  See Doc. Nos. 26-30.  Subsequent to the hearing, the parties provided the court with proposed findings of fact and conclusions of law.  Doc. Nos. 32-34.

---

[2] Anyemu appears to have ranked 6th out of a class of 107 despite his readily apparent difficulties conversing in English.  *See* Ex. 50.

[3] The plaintiffs also filed a motion for class certification, which is pending.  Although the plaintiffs have requested interim relief for the proposed class, the court finds that any such relief is best addressed as the case progresses to avoid any unintended harm to unnamed class members.

## II. DISCUSSION

Before going any further, it is useful to identify what this case is not about. The plaintiffs are not seeking the creation of a new entitlement, or new and better schools. The plaintiffs are seeking admittance into a program that currently exists, and that is specifically designed for students with their unique language needs. The plaintiffs want to learn English, and the District operates a school that meets that purpose, admitting students that are identical to the plaintiffs in every way, but for their age. In official, public documents, the District promised to admit students, such as the plaintiffs, to that program.

Nor is this a case where the court is substituting its policy judgment for the District's. The court cannot—and should not—design curricula. Those judgments are properly left to the "educators rather than courts, who are in a better position ultimately to resolve the question [of] whether" one practice or another "is, on the whole, more beneficial than detrimental to the students involved." *Castaneda v. Pickard*, 648 F.2d 989, 996 (5th Cir. 1981). Still, the discretion allocated to the educators is subject to the direction of state and federal legislatures. As it happens, both of those legislatures have passed laws relevant here, and the court is bound to apply those laws. In short, the court has no discretion to decline to apply clear law to clear facts.

### A. Legal Standard

This court must weigh four factors to determine whether to issue a preliminary injunction: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Liberty Lincoln-Mercury Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009); *McNeil Nutritionals LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir.

2007). An injunction is an "extraordinary remedy" not to be awarded lightly. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When injunctive relief is appropriate, courts should still be "reluctant to grant an injunction any greater in scope than is absolutely necessary[.]" *Brennan by Brennan v. Sch. Dist. of Philadelphia*, No. 88-6869, 1988 WL 96798, at *6 (E.D. Pa. Sept. 16, 1988).

### B. Analysis

#### 1. Likelihood of Success on the Merits

After the conclusion of the evidentiary hearing, and consideration of all of the parties' respective submissions, the court holds that the plaintiffs are likely to succeed on the merits of their claims arising under state law and the Equal Education Opportunity Act ("EEOA"). One student who wants to go to school, and has provided sufficient documentation to obtain enrollment, is still not enrolled. That violates Pennsylvania law. And the ESL program at Phoenix does not sufficiently overcome the plaintiffs' language barriers, which violates the EEOA. Because the relief granted on these claims is sufficient to resolve the present motion, it is unnecessary to address the plaintiffs' Title VI and constitutional claims at this juncture.

##### a. State Law Claims

The District has an obligation to timely enroll all school age children within the school district. It has not met this obligation as to the plaintiffs.

In Pennsylvania, every child who has not graduated from high school has a right to attend the public schools in her district until the end of the school year in which she turns 21. *See* 24 P.S. § 13-1301 ("Every child, being a resident of any school district, between the ages of six (6) and twenty-one (21) years, may attend the public schools in his district, subject to the provisions of this act."); 22 Pa. Code § 11.12 (defining school age); *see also* 22 Pa. Code § 12.1(a) ("All

persons residing in this Commonwealth between the ages of 6 and 21 years are entitled to a free and full education in the Commonwealth's public schools.").

Regarding enrollment of school-age children, Pennsylvania regulations require that a "school district or charter school shall normally enroll a child the next business day, but no later than 5 business days of application." 22 Pa. Code § 11.11(b). None of the plaintiffs were enrolled within the five-day period. One is still not enrolled today. The District's position on this unenrolled individual is unclear, though the law is not. In formal pleadings and at times during the evidentiary hearing, the District took the position that it could deny enrollment to individuals, such as Alembe, who could not graduate before aging out. In later testimony, and in a motion to amend, the District abandoned this position, admitting that would be an impermissible reason to deny enrollment. But for some reason, Alembe remains unenrolled, and the District in its request for relief asks the court to deny Alembe's enrollment.[4]

To be clear, Pennsylvania law establishes a right to an education until an individual graduates or turns 21. Alembe has not graduated and has not turned 21. If he wants to go to school, the law requires the District enroll him within five days of his completed application.

The enrollment delays for the other students concern the court, but the District acknowledges that it is concerned by these delays as well, and is currently in the process of reviewing its enrollment procedures. The remaining defendants are all currently enrolled, which largely moots the issue as to them, and the court credits the District's representations that, going forward, it will comply with the legal requirements for enrollment imposed by Pennsylvania law.

---

[4] The court did not credit the District's explanation that Alembe was not enrolled because he missed an enrollment meeting, because Alembe's younger brother apparently missed the same meeting but was nonetheless enrolled, and in fact has since graduated. *See* Exs. 50, 51.

b.        Equal Education Opportunity Act

The plaintiffs are also likely to succeed on the merits of their EEOA claim.  The EEOA provides that "[n]o State shall deny equal educational opportunity to an individual on account of his race, color, sex, or national origin, by . . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in instructional programs."  20 U.S.C. § 1703(f).  To prevail under the EEOA, the plaintiffs must demonstrate the following: "(1) language barriers; (2) defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation in instructional programs."  *C.G. v. Pa. Dep't of Educ.*, 888 F. Supp. 2d 534, 575 (M.D. Pa. 2012).

Most of the analysis in an EEOA claim concerns the second prong: whether the school has taken "appropriate action."  The leading case for assessing that determination is *Castaneda v. Pickard,* 648 F.2d 989 (5th Cir. 1981), and multiple district courts have applied *Castaneda* to address the second prong.  *See C.G.*, 888 F. Supp. 2d at 575 (applying *Castaneda* to determine whether language program constitutes "appropriate action" under the EEOA); *see also Valeria G. v. Wilson*, 12 F. Supp. 2d 1007, 1017-18 (N.D. Cal. 1998) (same).

*Castenada* requires the court to carefully review the record to determine: (1) whether a school system is pursuing a program "informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy"; (2) whether the programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school; and (3) whether the program, once employed for a sufficient time period to give the plan a legitimate trial, produces "results indicating that the language barriers confronting students are actually being overcome."

*Castaneda*, 648 F.2d at 1009-10.  The test is conjunctive.  All three requirements must be fulfilled for the District's policy to comply with EEOA.  Here, the plaintiffs have demonstrated that the accelerated program at Phoenix does not meet the first and third prongs.

To meet the first prong, the District must show that the program at Phoenix is based on a sound educational theory for overcoming language barriers recognized by some experts in the field.  The court should not attempt to weigh "the relative merits of sound but competing bodies of expert educational opinion[.]"  *Id.* at 1009.  Instead "the court's responsibility, insofar as education theory is concerned, is only to ascertain" whether the school is pursuing a program informed by some sound theory.  *Id.*

The plaintiffs' expert, Dr. Helaine Marshall, testified convincingly that the "accelerated recovery program is totally inappropriate for [the plaintiffs]" and that there is "absolutely no[ contrary research.]"  The District did not offer any expert to the contrary.  Instead, the District offered its ESL Coordinator, who testified that the "structured immersion" technique is a sound theory generally for overcoming language barriers, but nothing persuasive to the court to contradict Dr. Marshall's testimony that this technique was not recognized as sound for an accelerated, credit-recovery program.  The Phoenix model of accelerated learning presents different language barriers than a traditional education program, and is particularly imposing for students who cannot yet understand the language in which the courses are taught.

And the District has even greater difficulty meeting the third prong.  Undisputed testimony offered in court shows that the District does not evaluate whether the "language barriers confronting students are actually being overcome" at Phoenix.  The ESL Coordinator acknowledged that "there is no data at this level that would allow us to determine whether the educational program, the ESL delivered to these students in with the Phoenix accelerated model

is working or not." Because the District did not disaggregate the Phoenix data to make this assessment, it could not demonstrate the effectiveness of the program to the court. Through her own efforts, Dr. Marshall was able to discern from limited data provided by the District that Phoenix's performance on literacy measures—the core measure of "overcoming language barriers"—was far worse than McCaskey's.

The plaintiffs have demonstrated that the District has not met two of the three *Castaneda* factors and, thus, that Plaintiffs are likely to succeed on the merits of its EEOA claim.[5]

### 2. Irreparable Harm to the Plaintiffs

Irreparable harm is shown where the movant suffers "potential harm which cannot be redressed by a legal or an equitable remedy following trial." *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir. 1994). "Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time." *John T. ex rel. Paul T. v. Commonwealth*, Civ. No. 98-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000).

Denial of a free public education, either by refusing or delaying enrollment, is irreparable harm. *See, e.g.*, *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) (observing that the "interruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's schooling, raises a strong possibility of irreparable injury"); *L.R. ex rel. G.R. v. Steelton-Highspire Sch. Dist.*, No. 1:10-CV-00468, 2010 WL 1433146, at *3-4 (M.D. Pa. Apr. 7, 2010) (holding that homeless student would be irreparably harmed "if he is not re-enrolled in the District"); *Oravetz v. W. Allegheny Sch. Dist.,* 74 Pa. D. & C.2d 733, 737-38 (Pa. Ct. Com. Pl.

---

[5] The other two factors in an EEOA claim, in addition to appropriate action, are plainly present here. The parties do not dispute that the plaintiffs have language barriers. Compl. at ¶¶ 1, 2; Answer at ¶¶ 1, 2. And after reviewing the students' educational records, and the five days of sworn testimony, the court credits the students' testimony that their participation was impeded.

1975) (recognizing that the "deprivation of educational rights can produce irreparable harm and establishes a need for prompt and immediate relief"); *Minnicks v. McKeesport Area Sch. Dist.,* 74 Pa. D. & C.2d 744, 749-50 (Pa. Ct. Com. Pl. 1975) ("Absence from school cannot be repaired by money damages or even by a subsequent reinstatement at a future period.").

Plaintiffs have been or are being denied a meaningful education through denial or delays in enrollment, and by placement at a school that fails to overcome their language barriers in violation of the EEOA.

### 3. Irreparable Harm to the Defendant

Placing the plaintiffs at McCaskey will not result in "greater harm" to the District that outweighs the ongoing harm to the plaintiffs in being excluded from equal educational opportunities. *See Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 167 (3d Cir. 1999) (explaining that the relevant question is not whether the defendant "would suffer some harm" but which of the two potential harms is greater). In balancing those potential harms, the court should be "unwilling to gamble with a child's education." *New Jersey v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011).[6]

The District has no interest in continuing practices that violate federal and state law. *Cf. Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. Sch. Dist.*, 233 F. Supp. 2d 647, 667-68 (D.N.J. 2002), *aff'd on appeal by Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514 (3d Cir. 2004). "Providing statutorily granted services

---

[6] Education is not merely a "'benefit' indistinguishable from other forms of social welfare legislation." *Plyer v. Doe*, 457 U.S. 202, 221 (1982). "Both the importance of education in maintaining our basic institutions, and its lasting impact of its deprivation on the life of the child, mark the distinction." *Id*. With that in mind, it is no surprise that when balancing the relative harms between students and schools, it is not uncommon for courts to side with the students. *See*, *e.g.*, *Abington Heights Sch. Dist. v. A.C.*, No. 14-00368, 2014 WL 1767193, at *11 (M.D. Pa. May 2, 2014) (finding balance of harms favored student seeking special education and that "any harm to the school district presents only solvable issues of a financial, staffing, and administrative nature").

to a child does not harm the school district; doing so is its function under state and federal law." *See John T.,* 2000 WL 558582, at *8.

Moreover, the District already has in place the International School, a program that can satisfy its legal duties to the plaintiffs. It also, according to official documents, appears to have designed a plan so that older students, like the plaintiffs, receive the benefit of the International School before entering the general school population, be it at McCaskey or at Phoenix if they are over 19. To its credit, the District knows what to do for children with language barriers—all that is required is that it do what it said it would do.

### 4. The Public Interest

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *American Tel. and Tel. Co. v. Winback and Conserve, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994); *L.R.,* 2010 WL 1433146, at *5. It is "undeniably in the public interest for providers of public education to comply with the requirements [of federal education law]." *L.J.,* 2007 WL 3252240, at *9; *see also Grube v. Bethlehem Area Sch. Dist.*, 550 F. Supp. 418, 424-25 (E.D. Pa. 1982).

The public interest clearly weighs in favor of granting a preliminary injunction to ensure the plaintiffs immediate enrollment in McCaskey and access to the meaningful education to which they are legally entitled.

### III.  CONCLUSION

The plaintiffs' motion presents straightforward legal issues that were ultimately easy to resolve. As to those issues, the law is clear: eligible students must be timely enrolled, and efforts to overcome language barriers must be sound and effective. The defendant has already

developed a program that meets these requirements and is operating it to great success. While there may be other means to comply with the law, the defendant does not currently offer one. Accordingly, and as detailed in a separate order, the court will grant the plaintiffs' motion for preliminary injunction.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.